**STATE, ex rel. DEPT. OF INDUS. RELATIONS, v. RUSSELL, d. b. a. CUY LA NURSING HOME.**

Common Pleas Court, Cuyahoga County.

No. 628204.

C. William O'Neill, Atty. Genl., Lloyd Evans, Asst. Atty. Genl., Columbus, John E. Olsen, Cleveland, for plaintiff-appellee.

Neil W. McGill, John James Brown, Cleveland, for defendant-appellant.

## OPINION

By THOMAS, J.

Pursuant to §1032-1 GC, the defendant, who operates Cuy La Nursing Home appeals Public Order 4190 issued under §1032 GC, by the plaintiff Ohio Department of Industrial Relations on November 9, 1950.

In a large house of frame construction located in Wickliffe, Lake county, with part of the property situated in Euclid, Cuyahoga county, the defendant operates a nursing home for women who are over 65 years of age. At the time of the court's inspection of the premises made at the request of the parties, 11 women, all of whom were observed to walk freely, resided on the second floor. The use of this second floor to shelter ambulatory residents is the subject of this appeal. Fire escapes lead to either end of the second floor, and the doors to these escapes are equipped with conventional rather than panic hardware and were unlocked at the time of the court's inspection.

The defendant is now licensed and has been licensed for several years by the Ohio Department of Public Welfare "to operate a home for aged or physically or mentally infirm as defined by §6289-1 GC." The present license "authorizes the care of a maximum of- 38 residents including not more than 20 bedfast or helpless patients on the first floor and fully ambulatory residents only on the second floor."

Notwithstanding the fact that the Ohio Department of Public Welfare has specifically granted the defendant the privilege of operating a home for the aged and of housing fully ambulatory residents on the second floor, another state department, the Department of Industrial Relations, is commanding her to cease using the second floor by an order which reads that "In homes of frame construction no patients shall be cared for other than on the first or grade floor."

Since the Department of Industrial Relations under §§1031, 1032 GC, seeks to stop the use of the second floor of defendant's home for the aged while simultaneously the Department of Public Welfare under §6289-1 GC, et seq., has licensed the use of said second floor of defendant's home it becomes necessary to examine and construe these several sections of law which give rise to apparently conflicting acts of two executive departments of the state government.

Sec. 6289-1 GC defines a rest home or convalescent home or boarding home for the aged or mentally or physically infirm

as "any place of abode, building, institution, residence or home used for the reception and care, for a consideration, of three or more persons who, by reason of age or mental or physical infirmities are not capable of properly caring for themselves, or who are sixty-five years of age or upwards."

**Sec. 6289-1 GC,** et seq., were enacted in 1941.

It is evident that the defendant operates a home as therein defined.

**Secs. 6289-2, 6289-3 GC,** require that such a home be licensed annually by the Department of Public Welfare of Ohio "in accordance with such rules and regulations as may be prescribed by the director of public welfare."

**Sec. 6289-4 GC** provides that:

"The department of industrial relations of the state of Ohio, the department of health and the division of state fire marshal, shall, upon the request of the department of public welfare of the state of Ohio, make such inspection of such home as may be deemed necessary and shall report in writing to the department of public welfare whether the building or buildings used or intended to be used for such home are substantially safe for the purpose intended, and in compliance with the building code of the state, and such other findings and recommendations as may be requested by the department of public welfare or deemed necessary by the department making such reports.

"No license shall be granted unless the director of public welfare shall be satisfied that such home is satisfactory in construction, fire prevention and protection, heating, water supply and sanitation, and that it is adequately equipped and maintains a personnel sufficient in number and training to care properly for inmates of such home."

By duly promulgated regulations the director of public welfare on the 9th day of February, 1950, has ordered that:

"No license shall be issued by the division of social administration for the operation of a home for the care of the aged as defined by §6289-1 GC unless the division has received a statement in writing, as required by §6289-4 GC, from each of the following departments or divisions;

"(1) A statement from the Department of Industrial Relations of the state of Ohio showing whether or not the building in which the applicant proposes to operate or is operating is substantially safe for the purpose intended.

"(2) A statement from the state or local department of health showing whether or not the water supply of the applicant is safe, and whether or not adequate sanitary facilities are being maintained on the premises of the applicant.

"(3) A statement from the division of the state fire mar-

shal or from an authorized fire official having jurisdiction over the area in which such home is located, shows whether or not the building or buildings of the applicant are satisfactory in construction, have adequate means of escape and proper facilities for fire protection."

Though the record does not clearly show whether or not the statements required by said regulations were obtained prior to the issuance of the license, it must and will be presumed from its issuance that the requirements of the law and the regulations have been met.

Public Building Order 4190 is issued in accordance with §1032 GC and therefore must draw its life from whatever powers are vested in the Department of Industrial Relations by §§1031, 1032 GC. These cognate sections became law in 1908.

Sec. 1031 GC provides for the "Department of Industrial Relations to inspect all school houses, colleges, opera houses, halls, theaters, churches, infirmaries, children's homes, hospitals, medical institutes, asylums, and other buildings used for the assemblage or betterment of people in the state."

It is clear that homes for the aged are not expressly enumerated in §1031 GC though conceivably they may fall within the language "asylums, and other buildings used for the assemblage or betterment of people in the state." See 1939 A. G. Opinions 1125.

Sec. 1031 GC goes on to say that "such inspections shall be made with special reference to precautions for the prevention of fires, the provision of fire escapes, exits, emergency exits, hallways, air space, and such other matters which relate to the health and safety of those occupying or assembled in such structures."

Sec. 1032 GC follows up with the provision that the inspector shall file with the Department of Industrial Relations a written report of the condition of the building inspected.

It further provides that "if it is found that necessary precautions for the prevention of fire or other disaster have not been taken or that means for the safe and speedy egress of persons assembled therein have not been provided, such report shall specify what appliances, additions or alterations are necessary therefor." The Department shall thereupon "issue an order in writing stating what necessary appliances, additions or alterations shall be added to or made in such structure."

From a comparison of §§1031, 1032 GC with Sec. 6289-1 GC, et seq., several conclusions are warranted.

The purpose of §§1031, 1032 GC, is to make public buildings safe for their occupants in the event of fire or other disaster.

One of the purposes of §6289-1 GC, et seq., is to make homes for the aged safe and satisfactory under all conditions.

Both §§1031, 1032 GC and Sec. 6289-1 GC, et seq., provide for inspections by the Department of Industrial Relations to accomplish the purposes of the statutes, however §6289-1 GC, et seq., provides for additional inspections by the department of health and the state fire marshal.

The purposes of each statute can be attained through sanctions if necessary. §§1031, 1032 GC, employes the order as its remedy, while 6289-1 GC, et seq., affords the more effective power of licensing with the power to revoke if the requirements of safety, sanitation, and competent supervision are violated.

There is one important distinction between the statutes. Secs. 1031, 1032 GC, relate generally to several classes of public buildings. Sec. 6289-1 GC, et seq., enacted 33 years later, are obviously and expressly designed and framed to deal with the supervision and control of homes for the aged and other rest and convalescent homes.

Whether there may be a conflict between the enforcement of these statutes with relation to rest and convalescent homes is no longer speculative or academic.

The defendant, in her operation of a home for the aged, is being ground between the upper millstone of §§1031, 1032 GC, and the lower millstone of §6289-1 GC, et seq. But if a venerable tool of statutory construction is applied the compression is quickly ended.

"Where the general provisions of a statute are found to be in conflict with the express provisions of a later act relating to a particular subject, the latter will govern although the words of the earlier general act, standing alone, would be broad enough to include the subject to which the more particular provisions relate." **Thomas v. Evans, 73 Oh St, 140,** syllabus one.

Being a later statute which relates specifically to the supervision, and control of the safety of homes for aged, §6289-1 GC, et seq., must prevail and will be enforced while §§1031, 1032 GC, being an earlier and more general statute, by virtue of the enactment of §6289-1 GC, et seq., is nullified insofar as the homes defined in §6289-1 GC are concerned.

Thus §6289-1 GC, et seq., must be read as an exception to §§1031, 1032 GC; **State, ex rel. Steller v. Zangerle, 100 Oh St, 414.**

Thus it is concluded that Public Building Order 4190 conflicts with §6289-1 GC, et seq., and is invalid, and ineffective.

But there is yet another reason why Public Building Order 4190 cannot be upheld.

It is obviously predicated upon Bulletin 106 of the Department of Industrial Relations which bulletin purports to promulgate building specifications for hospitals and homes. Homes are therein defined as including "all buildings or parts of buildings used or designed to be used for the care or shelter of the poor, the aged or children," which definition is broad enough to include Cuy La as a home for the aged.

By Section 3-a of said Bulletin 106, it is provided that:

"Hospitals and homes of frame construction shall be not more than one (1) story in height, * * * the first floor level shall be not more than four (4) feet above the grade at any entrance to or from the building and the building shall be limited in size and area to accomodate not more than twenty (20) persons. * * *."

If Bulletin 106 is effective, it would appear that Section 3-a would apply to a home of frame construction, such as Cuy La Home, provided said Section 3-a could be reconciled with §6289-1 GC, et seq.

However, such reconciliation need not be tried since upon examination it seems clear that the Department of Industrial Relations wholly lacks the power to issue Bulletin 106.

Counsel for the Department of Industrial Relations reported at the last hearing of this matter that Bulletin 106 in its present form was originally issued by the Industrial Commission of Ohio prior to the establishment of the Department of Industrial Relations. The Industrial Commission of Ohio was established in 1913, while the Department of Industrial Relations was not created until 1921.

Counsel further relates that his research shows that the Department of Industrial Relations, since its formation, has issued Bulletin 106 as originally pronounced by the Industrial Commission of Ohio merely substituting the name of the Department of Industrial Relations for that of the Industrial Commission of Ohio.

It is clear that §871-22 (3), (7) GC fully authorized the Industrial Commission of Ohio to promulgate Bulletin 106.

But it is equally clear that while many of the powers of the Industrial Commission have been transferred to the Department of Industrial Relations, §871-22 (3) through (8) GC, including the powers to issue orders, rules and regulations, have been expressly retained in the Industrial Commission.

Nor is there any other section of the General Code of Ohio which does vest the Department of Industrial Relations with power to promulgate rules and regulations which have the force and effect of law.

Plainly §154-8 GC authorizes the Director of the Industrial

Relations Department, as an executive department, to prescribe "regulations not inconsistent with the law for the government of his department, the conduct of its employees, the performance of its business and the custody, use and preservation of the records, papers, books, documents and property pertaining thereto." This section empowers the Department of Industrial Relations to adopt regulations necessary for the administration of the internal affairs of the department. But this section does not expressly bestow upon the department any power to issue regulations affecting the rights of persons outside the department with the full force and effect of law.

It has been intimated that perhaps §871-24 GC may give the Department of Industrial Relations the power to issue regulations. This section, however, transferred to the Industrial Commission, the powers of various agencies including the powers of the chief inspector of work shops and factories; and these powers of the Industrial Commission of Ohio subsequently were transferred to the Department of Industrial Relations by §154-45 GC. Thus the Department of Industrial Relations becomes the receiver of all powers once exercised by the chief inspector of work shops and factories, and still provided by law. But no section of law has been suggested and none has been found which empowers the chief inspector of work shops and factories to issue regulations of the type of Bulletin 106.

Finally, the Ohio State Building Code §12600-1 through §12600-299 GC contains no provision which authorizes the Department of Industrial Relations to promulgate rules or regulations having the force and effect of law.

It is interesting to note that §12600-1 GC of the Ohio State Building Code, as enacted in 1911, provided in part as follows:

"OHIO STATE BUILDING CODE
PART 2.
SPECIAL REQUIREMENTS

Section 12600-1

Preamble

Under part two which follows, will be found under their respective titles. the various classes of buildings covered by this code together with the special requirements for their respective design, construction and equipment.

The classification of the various buildings will be found under the following titles, viz:

Title 1. Theaters and assembly halls.
Title 2. Churches.
Title 3. School buildings.

Title 4. Asylums, hospitals and homes.

Title 5. Hotels, lodging houses, apartments and tenement houses.

Title 6. Club and lodge buildings.

Title 7 Workshops, factories and mercantile establishments.
* * *""

It is evident that this preamble expressed an intent that later sections of the Building Code would provide special requirements for the various types of buildings there listed including "Asylums, hospitals and homes."

However, an examination of the remaining sections of the Ohio State Building Code as originally passed, reveals that no special requirements were ever provided for any type of building other than theaters, assembly halls and schools.

In 1925 (111 V. 136) §12600-1 GC was amended so as to refer only to theaters, assembly halls and school buildings.

But at no time has the Ohio State Building Code ever given ▌the Department of Industrial Relations the power to adopt any rule or regulation which would have the force and effect of law.

It is therefore concluded that Bulletin 106 is unauthorized, and without any force and effect.

Preserving the safety of the aged residents of the second floor of Cuy La Home from the hazard of fire or other disaster undoubtedly is the objective which prompted the Department of Industrial Relations to inspect Cuy La Home and to issue Public Building Order 4190.

Though the invalidity and ineffectiveness of Public Building Order 4190 for the reasons noted compel its vacation, the objective which may well have led to its issuance can be achieved under the proper application and enforcement of §6289-1 GC, et seq., and the derivative regulation of the Director of Public Welfare of February 9, 1950.

With the Department of Public Welfare given primary responsibility for licensing and supervising homes for the aged under §6289-1 GC, et seq., but with the Department of Industrial Relations and the other named departments investigating and certifying the satisfactory character of the premises as required by the regulation of the Director of Public Welfare, surely the several departments can harmonize their respective functions to attain the goal of safety which should be common to each.

Whether or not the second floor should be continued to be used for ambulatory residents, and whether or not if the second floor is so used panic hardware or other additional safety devices should be employed, are questions which the

Department of Public Welfare must resolve within the framework of §6289-1 GC, et seq., and its regulation and with the assistance of the Department of Industrial Relations.

Defendant will prepare an appropriate order vacating and setting aside Public Building Order No. 4190.